**TRENK ISABEL, P.C.**
Richard D. Trenk, Esq.
Robert S. Roglieri, Esq.
290 W. Mt. Pleasant Ave., Suite 2350
Livingston, New Jersey 07039
Telephone:  (973) 533-1000
Email:  rtrenk@trenkisabel.law
Email:  rroglieri@trenkisabel.law

*Proposed Counsel to Dean R. Mon,*
*Chapter 11 Debtor and Debtor-in-Possession*

**UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF NEW JERSEY**

| | |
|---|---|
| In re:<br><br>DEAN R. MON,<br><br>　　　　　　Debtor. | Chapter 11<br><br>Case No. 21-14511 (___) |

**DECLARATION OF CHAPTER 11 DEBTOR DEAN R. MON**
**IN SUPPORT OF CHAPTER 11 FILING**

**DEAN R. MON,** of full age, pursuant to 28 U.S.C. § 1746, hereby certifies and declares as follows:

　　1.　　I submit this declaration in support of the voluntary petition for relief under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code") filed on my behalf.  I am fully familiar with the facts and circumstances set forth herein.

**Background**

　　2.　　I am a native of Cuba who emigrated to the United States at the age of 14.  I am currently 73 years old.

　　3.　　I currently reside at 345 Ocean Boulevard, Apartment 306, Long Branch, New Jersey (the "Apartment").  On or about March 13, 2021, I entered into a lease with Blackridge Realty, Inc.

1

for the Apartment and moved to Long Branch at the end of March 2021. I moved to the Apartment as a result of selling my home located at 414 Chicago Boulevard, Sea Girt, New Jersey. Because of my poor credit, I was required to pre-pay the rent due under the lease.

4. I became a New Jersey resident in 1964. After graduating from Bergenfield High School, I attended and received a Bachelor of Science degree in chemical engineering from Newark College of Engineering (now known as New Jersey Institute of Technology).

5. I served in the United States Army from 1968 until 1970, achieving the rank of Sergeant, and served a tour of duty in Vietnam. I was Honorably Discharged.

6. I was employed with American Cyanamid and Celanese Corporation for approximately eight (8) years from approximately 1975 until 1983.

7. I have been involved in real estate development for over thirty-five (35) years. I have constructed over 700 units consisting of duplexes, condominiums, apartments, multifamily and single-family homes, and workforce housing in Monmouth County, Bergen County, Hudson County and Somerset County.

8. I have served as Chairman of the Board of the National Association of Home Builders. I was inducted into the New Jersey Builders Association ("NJBA") in 1996 and named Builder of the Year in 1998. In 2000, I received the NJBA Affordable Housing Award.

9. In 1985, I formed D.R. Mon Group, Inc. ("DRMG") which provides general contracting services for residential projects. DRMG holds a New Jersey Builders Registration License, which allows it to provide general contracting services. DRMG is in the process of updating this license, which expired on March 31, 2021. In 2011, I formed MJM Real Estate, LLC ("MJM") to provide real estate services for the sales and leasing of residential projects. Finally, in 2013, I formed MonGroup Properties, Inc. ("MonGroup") to provide property management services. I own 100% of

these entities.

10. Wanessa Vaccaro is the Chief Financial Officer and Chief Operating Officer of MonGroup. Ms. Vaccaro is a licensed New Jersey real estate broker and certified apartment manager. Ms. Vaccaro graduated from Monmouth University earning a Bachelor of Science in business administration with concentration in finance and a minor in Spanish. NJBIZ, the leading business trade publication in New Jersey, has included Ms. Vaccaro in its Forty Under 40 class. Ms. Vaccaro is the broker of record for MJM.

**Litigation Concerning 175 West 7th Urban Renewal, L.L.C.**

11. I am the seventy (70%) percent owner of 175 West 7th Urban Renewal, L.L.C. ("175 West"). It is an urban renewal entity formed and qualified to do business under the provisions of the Long Term Tax Exemption Law of 1992, as amended and supplemented, N.J.S.A. 40A:20-1 et seq. (the "Tax Exemption Law").

12. On or about January 4, 2017, the Bayonne Planning Board adopted Resolution No. P-16-037 granting preliminary and final major site plan approval and bulk variance relief to Jinco Inc. to allow the construction of a five (5)-story building with fifty-six (56) workforce residential units and fifty-six (56) onsite parking spaces (the "Prior Project") on the property known as 175 West 7th Street, Bayonne, New Jersey 07002, identified as Block 304, Lot 1 on the official tax maps of the City of Bayonne (the "Property").

13. The Property is located within the boundaries of the 8th Street Station Rehabilitation Areas Plan Area – an area in need of rehabilitation pursuant to the Local Redevelopment and Housing Law, N.J.S.A. 40A:12A-1 et seq. (the "Redevelopment Law"). The Property is also located within an Urban Enterprise Zone (a "UEZ").

14. On or about July 31, 2017, 175 West 7th, LLC – 175 West's predecessor in interest – acquired title to the Property from Jinco, Inc.

15. On or about August 22, 2017, 175 West 7th, LLC entered into a purchase and sale agreement with Jinco, Inc. to purchase certain land use approvals for the Property to commence the Prior Project, and proposed adding both seven (7) new on-street parking spaces on 7th Street and common space areas, including a lounge/gym area and an outdoor roof deck located on top of the first floor parking garage which would include seating and planters (the "Current Project").

16. At the time of the purchase and sale of the Property, I was the owner of 100% of the membership interests in 175 West 7th, LLC. See id.

17. On or about November 14, 2017, to help finance the Current Project, 175 West 7th, LLC executed and delivered to Bayonne Community Bank ("BCB") a Revolving Credit Note (the "BCB Note") in the amount of $2,184,000, with initial monthly payments commencing on January 1, 2018 and continuing on the first calendar day of each consecutive month thereafter, with all remaining principal, interest, costs and fees due and payable to BCB on the maturity date of December 1, 2018.

18. On or about November 14, 2017 – the same day the BCB Note was executed – I executed an Unlimited Guaranty of Payment and Performance (the "BCB Guaranty"), and thereby absolutely and unconditionally guaranteed the full and punctual payment and satisfaction of the BCB Note.

19. On or about April 2, 2018, 175 West 7th, LLC applied to and received from the New Jersey Department of Community Affairs a certificate of compliance dated April 2, 2018 authorizing it to amend its certificate of formation to qualify as an urban renewal entity and change its name to 175 West 7th Urban Renewal, LLC – its current name.

20. On or about April 17, 2018, the Hudson County Planning Board adopted Resolution No. 2018-003-SP approving 175 West's application for site plan approval for the Current Project, along with certain conditions.

21. On or about August 15, 2018, the City Council for the City of Bayonne adopted Ordinance No. O-18-46 approving the proposed financial agreement between 175 West and the City of Bayonne granting 175 West a tax exemption for the Current Project under the Tax Exemption Law.

22. On or about August 15, 2018, the City Council for the City of Bayonne also adopted a resolution authorizing the execution of a redevelopment agreement between 175 West and the City of Bayonne designating 175 West as the redeveloper of the Property in accordance with the Redevelopment Law.

23. On or about August 10, 2018, I entered into a Membership Interest Purchase Agreement (the "Membership Purchase Agreement") with WLL 175 West No.1 LLC and WLL 175 West No. 2 LLC (collectively, the "WLL Entities"), in which the WLL Entities each acquired 15% of 175 West for $900,000 total. Bruce L. Epstein executed the Membership Agreement on behalf of the WLL Entities.

24. On or about August 10, 2018 – the same day the Membership Agreement was executed – the WLL Entities and I also entered into the Amended and Restated Operating Agreement (the "Operating Agreement"), to both memorialize the agreements between the parties concerning the conduct of the affairs of 175 West and designate Mr. Epstein as the sole, authorized representative of both West No. 1 and West No. 2.

25. I was designated sole managing member pursuant to Section 13.1.8 of the Operating Agreement and DRMG was designated as general contractor of the Project pursuant to Section 13.8.2 of the Operating Agreement.

26. On or about August 10, 2018, the WLL Entities and I executed an Assignment of Membership Interest (the "Assignment"), in which I assigned 15% of my membership interest in 175 West to each of the WLL Entities.

27. On or about October 19, 2018, the WLL Entities and I entered into the First Amendment to the Operating Agreement (the "First Amendment").

28. On or about November 15, 2018, after I reached out to BCB to secure additional necessary funding for the Current Project, BCB issued a Commitment Letter to 175 West for a $11,542,000 construction loan and $9,600,000 permanent loan, of which only I would personally guarantee the full amount (the "First BCB Commitment Letter").

29. Mr. Epstein was unwilling to personally guarantee the BCB Note.

30. On or about January 25, 2019, after I reached out to BCB to secure additional necessary funding for the Current Project, BCB issued a Commitment Letter to 175 West for a $12,600,000 construction loan and $9,600,000 permanent loan, of which only I would personally guarantee the full amount (the "Second BCB Commitment Letter").

31. On or about April 11, 2019, after I reached out to BCB to secure additional necessary funding for the Current Project, I arranged for Mr. Epstein to meet with representatives of BCB for the first time.

32. At the April 11, 2019 meeting with BCB, both Mr. Epstein and I for the first time learned of the Second BCB Commitment Letter. Additionally, Mr. Epstein refused to approve the Second BCB Commitment Letter, despite not having to personally guarantee any amount of it.

Upon information and belief, Mr. Epstein initially refused and then delayed in executing the necessary paperwork for BCB to perform a U.S. Patriot Act search of the WLL Entities and demanded that BCB sign a nondisclosure agreement.

33. On or about September 18, 2019, after I reached out to BCB to secure additional necessary funding for the Current Project, BCB issued a Commitment Letter to 175 West for a $13,600,000 construction loan and a permanent loan in an amount not to exceed 70% of the construction loan to be determined at conversion, of which only I would again personally guarantee the full amount (the "Third BCB Commitment Letter").

34. Mr. Epstein again refused to approve the Third BCB Commitment Letter, despite again not having to personally guarantee any portion of the BCB Note. Upon information and belief, Mr. Epstein again delayed in obtaining the necessary paperwork for BCB to perform a U.S. Patriot Act search of the WLL Entities, but eventually provided same. Additionally, and upon information and belief, Mr. Epstein again demanded that BCB sign a nondisclosure agreement.

35. Based on the Third BCB Commitment Letter, BCB's counsel prepared draft loan documents and forwarded same to Michael Fink, Esq., counsel to 175 West, for review. The day Mr. Fink returned his comments, he was informed by counsel for BCB that BCB was not going forward with the loan and closing.

36. In or around January 2020, Matthew Wilson, a commercial loan officer with BCB, called to inform me that BCB was withdrawing the Third BCB Commitment Letter and was no longer offering 175 West any construction or permanent loan funding for the Current Project.

37. Thereafter, upon information and belief, Mr. Epstein refused to either personally guaranty any loan from BCB, invest any more money into the Current Project, or seek to obtain alternative financing for the Current Project.

38. On or about December 31, 2019, after Mr. Epstein and the WLL Entities refused to either consent to any BCB loan financing or provide any additional funding to 175 West, I was forced to make various loans to 175 West.

39. From December 31, 2019 through January 11, 2021, I made twenty-two (22) personal loans/advances to 175 West which were necessary to meet the Current Project's critical expenses. These loans totaled $232,204.33.

40. To date, 175 West repaid $34,750 of same – leaving a loan balance of $197,454.33.[1] Throughout this time, the WLL Entities never made any loans to 175 West. My loans were used to satisfy obligations due for site improvements and loan extension fees and interest due to BCB.

41. On or about June 10, 2020, left with no other option of how to finance the Current Project or pay off accruing debt related to the Current Project, Marcus & Millichap Real Estate Investment Services ("Marcus & Millichap"), a national real estate brokerage firm, was retained to attempt to secure an investor for the Current Project.

42. However, Marcus & Millichap's efforts to secure an investor for the Current Project were unsuccessful. In doing so, Marcus & Millichap made contacts with hundreds of potential investors.

43. In particular, Marcus & Millichap aggressively marketed same as a joint venture with 175 West, offering 50% ownership of same for $4,000,000 – which was the preferred option by 175 West. In doing so, Marcus & Millichap secured fifty-three (53) potentially interested investors, of which half were interested in a joint venture and the other half were instead interested in a straight purchase of the Property and all related land use approvals for the Current Project.

---

[1] Additional unpaid accrued interest on Mr. Mon's loans through February 15, 2021 totals $9,238.74.

44. Of the potentially interested investors, only three (3) seriously considered same – and all three (3) ultimately passed on same.

45. In or around September 2020, I, on behalf of 175 West, executed a Maturity Extension Agreement to, among other things, extend the maturity date of the BCB Note through December 31, 2020 (the "BCB Note Extension").  See Verified Complaint, Exhibit C.

46. On or about November 17, 2020, after failing to secure any investors, Marcus & Millichap instead focused its efforts on securing a purchaser for the Property and all related land use approvals for the Current Project for an asking price of $8,600,000.

47. Throughout this time, Marcus & Millichap was only able to secure three (3) offers for the purchase of the Property and all related land use approvals for the Current Project: (1) one for $4,000,000; (2) one for $4,500,000 to $5,000,000; and (3) another for $4,000,000 which, after further review, was ultimately withdrawn by the potential buyer altogether.

48. Additionally, Marcus & Millichap again reached out to the roughly twenty-seven (27) potential investors that were originally interested in a straight purchase of same a few months earlier.  However, all of such potential investors passed on the offer entirely.

49. On or about December 1, 2020, Marcus & Millichap presented a fourth offer from Avi Gagin of West of Hudson Properties ("Gagin") at an offer price of $8,100,000 to purchase the Property and all related land use approvals for the Current Project (the "Offer Letter").  Originally, Gagin's opening offer was $7,000,000, but Marcus & Millichap were able to negotiate same up to $8,100,000.[2]

50. No other offers have been received to purchase the Property.

---

[2] Upon the conclusion of due diligence, Gagin negotiated an amendment to the contract whereby due diligence closed for all purposes and the purchase price was reduced to $7.6 million.

51. On or about December 1, 2020, 175 West defaulted under the terms of the BCB Note and the BCB Note Extension by failing to make the monthly payment due.

52. On or about December 2, 2020, in response to Wanessa Vaccaro emailing him the Offer Letter, Mr. Epstein responded via email that "the sale is NOT approved" as he and his partners would receive 30% of the approximately $1,600,000 in total net proceeds of the sale.

53. On or about December 31, 2021, 175 West further defaulted under the terms of the BCB Note and the BCB Note Extension by failing to pay the entire remaining balance of the principal, interest, costs and fees to BCB on the maturity date.

54. On or about January 21, 2021, my counsel sent a dispute notice to Mr. Epstein pursuant to Section 13.7 of the Operating Agreement (the "Dispute Notice"), detailing efforts made to keep Mr. Epstein informed of all aspects of the proposed contract of sale, 175 West generally, and demanding he act in "good faith" to resolve the dispute of not consenting to the proposed contract of sale within ten (10) days of receiving the Dispute Notice or face arbitration.

55. On or about January 22, 2021, BCB served a summons and complaint in the matter captioned BCB Community Bank v. 175 West Urban Renewal LLC f/k/a 175 West 7th LLC and Dean R. Mon, Docket No. MON-L-0215-21, in the Superior Court of New Jersey, Law Division, Monmouth County seeking judgment against both 175 West and me for damages and other relief pursuant to their default under the BCB Note, the BCB Note Extension, and the BCB Guaranty (the "BCB Action"). BCB has also filed a foreclosure action captioned BCB Community Bank v. Dean R. Mon, et al.; Docket No. F-785-21 in the Superior Court of New Jersey (the "Foreclosure Action"). BCB has filed a motion for summary judgment to strike the answer.

56. Despite my repeated efforts to purchase the Property, commence the Current Project, acquire the necessary financing for same from BCB by personally guaranteeing all of

same, inject $197,454 of his own funds into the Current Project, and salvage value in 175 West by both securing the Offer Letter – an above-market offer for the Property that will satisfy all outstanding liens/claims that exist against the Current Project for net proceeds of approximately $1,500,000 – and executing the Contract, Mr. Epstein and the WLL Entities have unreasonably refused to consent to the Offer Letter or the Contract and failed to negotiate the Offer Letter or the Contract in good faith.

57. As a result of these issues, on January 28, 2021, the WLL Entities filed a complaint and order to show cause in the Superior Court of New Jersey, Hudson Vicinage, Chancery Division captioned WLL 125 West No. 1 LLC, et al. v. Mon, Docket No. HUD-C-5-21 (the "Partnership Dispute").

58. In response, on February 2, 2021, I filed a Verified Answer, Affirmative Defenses, Counterclaims, Demand for Damages and Other Relief in the Partnership Dispute. On the same date, I also filed a motion seeking emergent relief from the Chancery Court, seeking amongst other things, approval to sell the Property with all debts to be satisfied at the closing and net proceeds being held in an attorney trust account.

59. Following a hearing on February 18, 2021, the Honorable Jeffrey R. Jablonski, P.J. Ch. entered an order denying the relief sought and ordering the parties to engage in a marketing process for the sale of the Property. Thereafter, the Chancery Court entered a consent order permitting the retention of Jones Lang LaSalle Americas, Inc.[3] to market the Property. At this time, no better offers have been received. The Consent Order also provided for a further hearing on May 25, 2021.

---

[3] This national real estate brokerage firm was specifically chosen by Mr. Epstein and the WLL Entities.

60. On May 25, 2021, the Honorable Mary K. Costello, P.J. Ch.[4] conducted the further hearing in the Partnership Dispute in accordance with the Consent Order. Presiding Judge Costello heard the arguments of the parties and reserved on deciding whether to approve the sale of 175 West. As of this filing, no decision has been rendered.

61. Ensuring the continued viability of the Current Project has been a substantial drain on my personal finances.

62. In addition to the Partnership Dispute and the BCB Action, 175 West is subject to the following debts and litigation:[5]

| Name of Creditor/Claimant | Date of Claim | Status | Asserted Amount[6] |
|---|---|---|---|
| Concrete Systems, Inc. | September 2, 2020 | HUD-3182-20 pending in Hudson County | $1,649,810.48; Litigation pending |
| Dynamic Earth, LLC; Dynamic Survey, LLC | October 8, 2019 | Construction Lien; HUD-L-3090-20 | Dynamic Earth: $110,064.56 / Dynamic Survey: $15,187.48; Litigation Pending for both |
| Simpson & Brown | December 1, 2020 | Demand for Arbitration | $518,220 |
| Core Transport | June 20, 2019 | Construction Lien filed September 5, 2019 | $103,178.80 |
| Esposito Construction, LLC | September 8, 2020 | HUD-L-1483-20; Stipulation of Settlement (payment not made) | $106,761.84 |
| Protec | April 8, 2020 | BUR-L-7970-20 | $41,717; Litigation pending |

---

[4] The Partnership Dispute was transferred to Presiding Judge Costello as a result of Judge Jablonski being appointed as the Assignment Judge in Hudson County.

[5] Some of these claimants and other creditors assert personal liability against me. Nothing contained herein shall be concede personal liability for these alleged obligations.

[6] By setting forth the asserted amounts in this chart, no party is waiving any rights or defenses with respect to such claims.

4813-7196-9002, v. 1

**Jaclyn 40, LLC**

63. Shortly after becoming involved in the Current Project, on or about October 2018, Mr. Epstein invested in a separate New Jersey Limited Liability Company called Jaclyn 40, LLC ("Jaclyn").

64. Jaclyn was formed to construct a 40-unit portion of an apartment complex in West New York, New Jersey (the "Jaclyn Project").

65. I owned 100% of the membership interests in Jaclyn and sold 25% of my membership interests to Mr. Epstein or his entity.

66. The Jaclyn Project was fully built and leased to various tenants at the time of Mr. Epstein's investment.

67. The Jaclyn transaction was substantially similar to the 175 West transaction concerning the purchase 30% of the ownership interests through the WLL Entities.

68. After Mr. Epstein would not agree as to financing and other issues related to Jaclyn, the Jaclyn Project was listed for sale with Marcus & Millichap.

69. Marcus & Millichap obtained a third-party buyer who purchased the Jaclyn Project. Mr. Epstein was paid from the net proceeds. Therefore, there is no remaining value for this entity.

**Liberty Park at Union City, L.L.C.**

70. I am also a 50% owner of Liberty Park at Union City, L.L.C. ("Liberty Park"). On January 14, 2016, I purchased a 50% interest in Liberty Park from Kirti Desai for $523,383.

71. Liberty Park consists of a 0.43-acre assemblage of seven contiguous vacant residential lots (Block 260, Lots 30-36 on the tax map of Union City) located on the corner of 38th Street and Bergen Turnpike in the R – Low Density Residential zone of Union City, New Jersey (the "Union City Property").

72. Liberty Park acquired the Union City Property on November 13, 2003. The Union City Property is approved and proposed to be developed with a four-story, 48-unit multifamily building above a two-story fifty-five car parking garage with two elevators. The approvals consist of sixteen one-bedroom, one-bath units, four two-bedrooms, one-bath units, and twenty-eight two-bedrooms, two-baths units.

73. Amboy National Bank holds a first mortgage lien on the Union City Property in the approximate amount of $470,738.44

74. Notwithstanding the approvals, the Union City Property remains raw undeveloped land. Construction has not begun at the Union City Property. Union City asserts that the approvals expired and that Liberty Park must reapply for new approvals.

75. Based upon the current state of the project, it is impossible to value my equity interest in Liberty Park.

**Other Litigation Issues**

76. I am also subject to various other litigation as a result of personal guarantees on behalf of 175 West and DRMG, including, but not limited to:

    a. The BCB Action;

    b. The Partnership Dispute;

    c. The Foreclosure Action;

    d. An eviction action captioned <u>BZK Holdings Broad, LLC, et al. v. Dean R. Mon, et al.</u>; Docket No. MON-LT-378-20 in the Superior Court of New Jersey, Monmouth Vicinage;

      e.      An action captioned <u>Jaclyn 55 Condominium Association, Inc. v. Dean R. Mon, et al.</u>; Docket No. HUD-L-1710-20 in the Superior Court of New Jersey, Hudson Vicinage;

      f.      An action captioned <u>Millennium Trust Company, LLC, et al. v. Dean R. Mon, et al.</u>; Docket No. MON-L-862-21 in the Superior Court of New Jersey, Monmouth Vicinage.  A motion for summary judgment is pending in this action; and

      g.      An action captioned <u>Peyton Advisory Services Inc. Defined Benefits Plan v. Mon, et al.</u>; Docket No. MON-L-3560-19 in the Superior Court of New Jersey, Monmouth Vicinage.

**<u>Reorganizational Purpose</u>**

77.    I come before this Court in an effort to reorganize my financial affairs, address as much of the pre-petition debt as possible, and maximize the value of our assets.

78.    I believe that through the sale of my interest in 175 West and reevaluating my budget, I can create and confirm a plan of reorganization that will benefit the various creditors, stakeholders and other parties in interest in this case.

Pursuant to 28 U.S.C. § 1746, I swear under penalty of perjury that the foregoing is true and correct to the best of my knowledge, information and belief.

_____
DEAN R. MON

Dated: May 28, 2021

4813-7196-9002, v. 1